SO ORDERED: December 28, 2006.



_____
**Anthony J. Metz III**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| Scott Lee Templin and | ) | |
| Heather Marie Templin, | ) | CASE NO. 02-20803-AJM-7 |
| | ) | |
| Debtors. | ) | |
| | ) | |
| Nancy J. Gargula, United States Trustee, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ADVERSARY PROCEEDING NO. 04-645 |
| | ) | |
| Scott Lee Templin, | ) | |
| Defendant. | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This matter came before the Court for trial upon the complaint filed by the United States Trustee (the "UST") to deny Scott Lee Templin a discharge of his debts. Trial on the complaint was held on December 13, 2006 where the UST appeared by counsel, Mark Drummond and Charles

Wharton; the Defendant appeared in person and by counsel, Bret Clement. The Court heard the evidence and considered the arguments of counsel. At the conclusion of the trial, the Court from the bench ruled that the UST did not meet the burden under 11 U.S.C. §727(a)(7) and (a)(4)(A) of proving that Templin knowingly and fraudulently made a false oath when he filed inaccurate financial reports in the Reliable Technical Services, Inc. chapter 11 case. In accordance with and in supplement to the findings and conclusions stated on the record, the Court now makes it written findings and conclusions pursuant to Fed. R. Bankr. P. 7052.

### FINDINGS OF FACT

The parties filed their stipulations of facts prior to trial and have stipulated to the following facts:

1. The Defendant and Debtor, Scott Lee Templin (the "Debtor"), filed for relief under Chapter 11 of the United States Bankruptcy Code on November 22, 2002.

2. The Debtor was president of Reliable Technical Services, Inc. ("Reliable"). On November 22, 2004, Reliable, by the Debtor as its president, filed for relief under Chapter 11 of the United States Bankruptcy Code in case number 02-20802-AJM-11.

3. Paragraph two of the Court's "Order Concerning Operation of the Debtor in Possession Under Chapter 11" entered November 27, 2002, in the Reliable case stated that Reliable was to ". . . verify compliance with Fed.R.Bankr.P. 2015(a)(3), concerning federal taxes deducted and withheld from employees, by submitting a copy of Internal Revenue Service Form 6123, Verification of Fiduciary's Federal Tax Deposit, to the IRS . . ."

4. Paragraph three of the Court's "Order Concerning Operation of the Debtor in Possession Under Chapter 11" entered November 27, 2002, in the Reliable case indicated that Reliable was to prepare monthly operating reports, on a form approved by the United States Trustee and file such reports with the Court.

5. On October 14, 2003, Reliable filed six of its monthly operating reports, covering the months of March 2003 through August 2003. The reports were signed by the Debtor and above each signature of the Debtor was a paragraph that expressly stated:

"The undersigned certifies under penalty of perjury that the information contained in this and accompanying reports is complete, true and correct to the best of my knowledge, information, and belief."

6. Within each report was a "Monthly Cash Flow Report" requiring Reliable to provide information, including cash receipts and disbursements for the month. Page two of each "Monthly Cash Flow Report" contained a section on the "Status of Taxes" which required the reporting of withholding taxes withheld and the amount paid. The "Status of Taxes" section of each report also required Reliable to "Attach photocopies of IRS Form 6123 or your FTD coupon and payment receipt to verify payments or deposits".

The operating reports filed on October 14, 2002 reported the following amounts reported and paid:

| Month | "Amount Paid" | Form 6123's Total | IRS receipts |
|---|---|---|---|
| **March 2003** | $ 15,972.15 | $ 15,972.15 | $ 3,838.56* |
| **April 2003** | $ 25,558.94 | $ 25,558.94 | $ 5,849.40 |
| **May 2003** | $ 29,278.46 | $ 29,278.46 | $0 |

| **June 2003** | $ 19,858.95 | $ 19,858.95 | $0 |
| **July 2003** | $ 17,184.23 | $ 17,184.23 | $0 |
| <u>**August 2003**</u> | <u>$ 22,659.63</u> | <u>$ 22,659.63</u> | <u>$ 5,094.25</u> |
| **Total** | $130,512.36 | $130,512.36 | $14,782.21* |

\* Templin believes that the amount paid for March 2003 may have been $7,733.49. However, the difference between the amount the U.S. Trustee believes was paid and the amount that Templin believes may have been paid is not material to the outcome of this case.

7. The Debtor prepared Reliable's monthly operating report for each of the months of November 2002 through February 2003 without the assistance of an outside accountant. Even though the Form 6123's for the period covered by the operating reports did not accurately reflect the amount of withholding taxes actually paid by Reliable, page 4 of the monthly operating reports prepared by the Debtor accurately reflect the amount of withholding taxes actually paid by Reliable.

8. The monthly operating reports for Reliable for each of the months of March 2003 through August 2003 (the "Fouts Prepared Reports") were all filed with the Court on October 14, 2003, and were prepared by Fouts & Co., LLC ("Fouts"). As shown by the preceding chart, the Fouts Prepared Reports do not accurately reflect the amount of withholding taxes actually paid by Reliable.

9. On or about March 10, 2004, the Debtor sent copies of *revised* Fouts Prepared Reports to interested parties in the Reliable case, including the Office of the U.S. Trustee. The revised Fouts Prepared Reports were personally prepared *by the Debtor without the assistance of an outside accountant*. Even though the Form 6123's for the period covered by the operating reports do not accurately reflect the amount of

withholding taxes actually paid by Reliable, page 4 of the revised Monthly operating reports prepared by the Debtor *accurately reflected the amount of withholding taxes actually paid by Reliable* with the possible exception of the amount paid during March 2003 indicated hereinabove.

10. Also on or about March 10th, the Debtor sent copies of monthly operating reports for September, 2003 through December 2003.  These reports were personally prepared by the Debtor without the assistance of an outside accountant.  Even though the Form 6123's for the period covered by the operating reports did not accurately reflect the amount of withholding taxes actually paid by Reliable, page 4 of the monthly operating reports prepared by the Debtor *accurately reflect the amount of withholding taxes actually paid by Reliable.*

11. Reliable paid its tax payments electronically.  In order to make payroll tax payments electronically, the taxpayer called a specified 800 number and entered its employer identification number and the amount of its tax liability, which authorized the electronic withdrawal of that amount from the taxpayer's checking account.  There would be a time delay of two to three days between the time of the telephonic authorization and the time that the funds were withdrawn.  If there were insufficient funds in the account at that time, the IRS sent a notice by mail advising the taxpayer of that fact and requesting that the taxpayer pay the amount that remained due.

12. During the period of March 2003 through March 10, 2004, the Debtor, in his capacity as president of Reliable, regularly gave the IRS telephonic authorization to withdraw funds from its checking account.  On each occasion where there were insufficient

                funds in the account at the time the funds were sought to be withdrawn, the IRS sent and Reliable received a notice of that fact.

13.     The IRS contracted with a third party to perform all or a portion of the operation of the above-described electronic funds transfer system, including the portion of the system responsible for the sending out notices of insufficient funds. References to the IRS in the previous stipulations include said third party administrator.

In addition to the foregoing stipulated facts, the Court makes the following findings of fact:

14.     The Debtor and his step-father, Jeffrey Hole ("Hole") started Reliable in 1991 as a temporary employment service. The Debtor and Hole each owned 50% of Reliable's common stock.

15.     During the early years of its operation, Reliable enjoyed some success as the Debtor focused his activities on employee relations and marketing while Hole handled the accounting end of the business. Reliable's accounting functions were handled out of an office in Muncie, Indiana, while the Debtor operated out of a sales office in Indianapolis.

16.     By the late 1990's, the relationship between the Debtor and Hole began to deteriorate. As a consequence, the Debtor devoted less time to Reliable' business and spent more time on other business activities. The situation deteriorated to the point that Hole closed the Indianapolis office out of which the Debtor operated leaving him no office from which to work.

17.     During the first half of 2001, the Debtor was aware that Reliable was experiencing some financial difficulties, but he was not aware of its actual financial condition,

including the fact that Reliable had failed to pay a substantial amount of payroll tax liability to the IRS.

18. On June 30, 2001, Hole committed suicide.

19. Following Hole's suicide, the Debtor stepped into a financial quagmire that he was ill equipped to deal with given his lack of financial and accounting acumen.

20. The Debtor was inexperienced regarding the accounting aspects of Reliable's business. Fortunately, Hole had hired several bookkeeping employees who were experienced enough to be able handle the day to day data entry and bookkeeping functions without a great deal of supervision and the Debtor relied entirely on them to keep these functions operating.

21. During the period after Hole's death and continuing throughout Reliable's Chapter 11 case, Reliable lacked the funds that would have enabled it to hire an in-house accountant. During the time immediately prior to and during Reliable's Chapter 11 proceeding, the Debtor received an annual salary from Reliable of $24,000.

22. Reliable retained counsel ("Reliable's Counsel") to represent Reliable in its chapter 11 proceeding.

23. Reliable had no cash flow or budgeting process. As a consequence, the Debtor did not know the amount of checks that were outstanding at any given time or the amounts that were likely to be deposited. Lacking such knowledge, the Debtor was generally unaware whether there would be sufficient funds in Reliable's account to cover the amounts of the taxes that he gave the IRS authority to withdraw. Despite not knowing whether there were sufficient funds in Reliable's account to cover the

tax liability, the Debtor nonetheless continued to at least authorize the IRS to withdraw the funds so that, in the event there were sufficient funds, the IRS would be paid.

24. On one occasion during Reliable's Chapter 11 case, the Debtor realized that there were insufficient funds available in Reliable's account from which the IRS could withdraw and called the IRS and asked whether the withdrawal authorization could be cancelled. After being advised that it could not be cancelled, the IRS employee noticed that were a number of unreturned authorizations and informed the Debtor that many such authorizations had not cleared.

25. Although the Debtor was aware of the need to file timely monthly operating reports, he had difficulty in understanding the standard monthly report form due to his lack of understanding of accounting and the pressures of operating the Reliable business while it was in a chapter 11. Consequently, he fell behind in filing Reliable's operating reports.

26. The Debtor prepared reports for the months of December 2002 and January 2003, which were filed on April 10, 2003 (the "Templin Prepared Reports"). Pursuant to the instructions contained on page 4 of the standard monthly report form, the Debtor attached copies of Form 6123's for the periods covered by the reports.

27. The Templin Prepared Reports showed that Reliable paid only $2,836.58 of its payroll tax obligations during that period and that it had an ending tax liability of $36,806.11 as of January 2003, notwithstanding that the IRS Form 6123's that

Reliable was required to attach to the reports showed that all of the tax had been deposited.

28. Notwithstanding the obvious discrepancy between the amounts shown as paid on the Form 6123's and on page 4 of each of the Templin Prepared Reports, no one ever called this discrepancy to the Debtor's attention or otherwise suggested to him that he was preparing the Form 6123's improperly.

29. After the Templin Prepared Reports were filed, Reliable again fell behind in filing its monthly operating reports. Acting on the advice of counsel, Reliable retained Fouts to prepare the monthly reports.

30. Paul Klumper ("Klumper") of Fouts traveled to Reliable's Muncie office and downloaded Reliable's accounting information from its Quick Books accounting software program and obtained whatever additional information he felt was necessary to perform the engagement.

31. The Fouts Prepared Reports covered March, 2003, through and including August, 2003. It is these six (6) operating reports prepared by Fouts upon which the UST's complaint against the Debtor is based.

32. On Friday, October 10, 2003, and in anticipation of a meeting that was to occur on Monday, October 13, 2003 between the Debtor and attorneys that represented certain secured creditors of Reliable, Fouts hand delivered the completed Fouts Prepared Reports to Reliable's Counsel 's office.

33. Reliable's Counsel briefly reviewed the reports and noticed that they showed that Reliable was losing money every month. Concerned with this development,

Reliable's Counsel discussed the reports with the Debtor by telephone on that Friday. The Debtor neither was furnished with copies nor had he seen copies of the Fouts Prepared Reports as of the time the telephone conversation with Reliable's Counsel occurred.

34. In the October 10th telephone conversation, Reliable's Counsel told the Debtor that Reliable would have a "tough time with creditors" if Reliable did not have sufficient cash flow to fund a chapter 11 plan. The Debtor told Reliable's Counsel that the account receivable figure on the Fouts Prepared Reports was understated and that Reliable's financial condition was "a lot stronger" than reflected. At trial on December 13, 2006, Reliable's Counsel did not recall whether he and the Debtor discussed the payroll tax numbers reflected on the Fouts Prepared Reports in the October 10th telephone conversation.

35. On October 13, 2003, and shortly before the scheduled meeting with Reliable's secured creditors' counsel, Reliable's Counsel met in person with the Debtor and instructed the Debtor to sign each of the six Fouts Prepared Reports.

36. The Debtor had not been furnished with copies of the Fouts Prepared Reports for review prior to the time that they were presented to him for signature. The Debtor reviewed the Fouts Prepared Reports for a couple of minutes and advised Reliable's Counsel that the reports were wrong because Reliable owed more tax liability than what the reports showed was owed. Reliable's Counsel advised him to go ahead and sign them and that the reports could be amended and corrected at a later date.

37. The Debtor testified at trial that he did not realize that Reliable's Counsel intended to file the Fouts Prepared Reports before amending them. Rather, the Debtor assumed that they would be amended prior to being filed.

38. In the couple of minutes that he had to examine the reports, the Debtor was unable to ascertain why the Fouts Prepared Reports were wrong, only that he believed that Reliable's tax liability was about $100,000 greater than that which was reflected on the reports. The Debtor did not realize that the reason the reports showed less liability due than what the Debtor believed was due was because the reports showed that withholding taxes had been paid that were not in fact paid.

39. After the Fouts Prepared Reports were signed, Reliable's Counsel did not mention the need to amend the reports and the Debtor did not contact Reliable's Counsel to inquire about amending the reports.

40. The Fouts Prepared Reports contained numerous errors that are apparent on the face of the reports including, *inter alia*, the failure to show any tax expense whatsoever on the accrual basis monthly income statements; salary and wage expenses on the accrual basis monthly income statements that consistently exceeded the aggregate salary, wage and tax expenses shown on the monthly cash flow reports with no corresponding payables reflected on the payables aging schedules; and an aggregate loss in excess of $89,000 shown on the monthly income statements with no payables reflected on the payables aging schedules.

41. The following table illustrates the discrepancies for each month from March through August, 2003:

| Month | Salary and Wages Accrual Basis | Payroll Taxes Accrual Basis | Combined Cash Payments to Employees, Officers and Tax Payments | Post-Petition Accounts Pay |
|---|---|---|---|---|
| **March** | $ 70,059.19 | $0 | $ 65,514.18 | $2,949.34 |
| **April** | $107,162.90 | $0 | $ 92,324.56 | $0 |
| **May** | $125,114.56 | $0 | $ 98,967.42 | $0 |
| **June** | $ 93,030.15 | $0 | $ 79,081.20 | $0 |
| **July** | $ 89,645.25 | $0 | $ 74,089.58 | $0 |
| **August** | $115,324.33 | $0 | $101,765.99 | $0 |

42. The August report showed a year to date loss of $89,169.94 on an accrual basis. In addition, each report showed accrued salaries and wages, ranging from approximately $70,000 to $125,000, but also showed for each month but March "0" in accrued payroll taxes. From an accounting standpoint, it is not possible to incur accrued salaries and wages – payroll – without also having incurred accrued payroll taxes.

43. From an accounting viewpoint it is not possible to pay an expense without having incurred the expense. Thus, the Fouts Prepared Reports that disclosed that taxes were paid in the monthly cash flow report which also show that no taxes were incurred in the monthly income statements are inconsistent on their face.

44. From an accounting viewpoint, the incurrence of salary and wage expenses that were not paid would give rise to a corresponding account payable. Thus, the Fouts Prepared reports that disclose that salary and wages were consistently incurred on the monthly income statements in excess of the cash paid in the monthly cash flow reports without giving rise to a corresponding payable are inconsistent on their face.

-12-

45. While it is theoretically possible to incur a loss on an accrual basis that would be disclosed in a monthly income statement without incurring any account payables, for example, in the case of non-cash expenses, such as depreciation, the Fouts Prepared Reports showed no non-cash expenses that would explain how Reliable could have incurred an $89,000 operating loss on an accrual basis without owing any account payables. Thus, the Fouts Prepared Reports were inconsistent on their face.

46. While a cursory review of the Fouts Prepared Reports might have indicated that Reliable paid its withholding taxes during the periods in question, anything more than a cursory review would have revealed the inconsistencies in the reports relating to the nonaccrual of taxes and the payment of taxes, as well as the other inconsistencies noted in these findings and would have prompted questions to be raised regarding those inconsistencies. Reliable's Counsel was not aware of these inconsistencies until his cross examination by the Debtor's counsel in the December 13, 2006 trial.

47. Apparently, it was decided or it evolved that Fouts would no longer prepare Reliable's operating reports. Thus, the duty of preparing Reliable's operating reports beyond August, 2003 either fell on or was assumed by the Debtor.

48. Reliable eventually fell behind on keeping current on the filing of the operating reports. This was due, in part, to the fact that the incorrect ending numbers for taxes on the last filed report for August 2003, prepared by Fouts would be the beginning numbers on the September 2003 report and the Debtor did not want to compound the problems created by the Fouts Prepared Reports by using their incorrect numbers in

-13-

the reports for subsequent periods. Thus, it was necessary for the Debtor to correct or revise the Fouts Prepared Reports before he could prepare reports for subsequent periods.

49. When he attempted to correct the Fouts Prepared Reports, the Debtor discovered numerous other errors in the expenses shown in those reports in addition to those errors that were apparent on the face of the reports. Because of the other errors, the job of correcting the Fouts Prepared Reports involved far more than simply correcting the amount of tax paid, but rather necessitated that the Debtor redo substantial portions of the reports. The Debtor experienced difficulty completing this task due to his lack of accounting knowledge and the constant pressures of operating a business in Chapter 11.

50. On February 20, 2004, the UST moved to convert or dismiss the Reliable case on the basis that no operating reports had been filed since August, 2003. This action by the UST provided the Debtor the additional motivation needed to complete both the revised Fouts Prepared Reports and the reports for the months of September 2003 through December 2003.

51. Although the revised Fouts Prepared Reports prepared by the Debtor were not filed with the Court, he prepared them with the specific intention that they would be filed with the Court and he assumed that they would be filed with the Court, just as the December, 2002 and January, 2003 operating reports he prepared near the beginning of case had been filed.

52. The Reliable chapter 11 case converted to a chapter 7 case on March 22, 2004.

## **CONCLUSIONS OF LAW**

1. This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §157 and the general order of the United States District Court for the Southern District of Indiana referring bankruptcy cases to the bankruptcy courts for this District.

2. This adversary proceeding is a core proceeding under 28 U.S.C. §157(b)(2). .

3. Under 28 U.S.C. § 1408 and 1409, this District is the proper venue for this adversary proceeding.

4. "The distinguishing feature of a Chapter 7 proceeding for the individual debtor is the discharge; after surrendering his non-exempt property for the benefit of creditors, the debtor is discharged from what remains of most of the debts he owed as of the date the bankruptcy petition was filed". *Matter of Turner*, 156 F.3d 713, 717 (7th Cir. 1998).

5. While the purpose of the Chapter 7 discharge is to provide a "fresh start", this fresh start is reserved for honest debtors. *In re Fink*, 351 B.R. 511, 521 (Bankr. N. D. Ill. 2006).

6. The denial of a discharge under any provision of Section 727(a) is not to be taken lightly, and one court has likened it to "financial capital punishment"...reserved "for the most egregious misconduct by a debtor". *In re Tauber*, 349 B.R. 540, 545 (Bankr. N. D. Ind. 2006). Thus, exceptions to discharge are construed strictly against the creditor and liberally in favor of the debtor. *In re Chadwick*, 335 B.R. 694, 700-01 (W.D. Wis. 2005).

7. The party seeking to deny discharge under any provision of §727)(a) has the burden of proving grounds for denial of discharge by a preponderance of the evidence. *In re Scott*, 172 F.3d 959, 966-67 (7th Cir.1999).

**11 U.S.C. §727(a)(7)**

8. The UST asks for denial of the discharge of debts in the Debtor's personal bankruptcy, even though the alleged "false oaths" were made not in the Debtor's personal bankruptcy case, but in the Reliable chapter 11 case.

9. 11 U.S.C. §727(a)(7) provides that the court shall grant the debtor a discharge, unless - the debtor has committed any act specified in paragraph (2),(3),(4),(5) or (6) of §727 on or within one year before the date of the filing of the petition, or during the case, in connection with another case, under this title or under the Bankruptcy Act, concerning an insider.

10. 11 U.S.C. §101(31) (B) (ii) states that the term "insider", if the debtor is a corporation, includes - an officer of the debtor. Thus, false oaths made by an individual in a corporate case can serve as grounds to deny an individual his discharge in his individual case as long as the corporation is an insider of the individual. See, *In re Krehl*, 86 F.3d 737 (7th Cir. 1996). Here, the Debtor does not dispute that he was an insider of Reliable, since he was the president of Reliable on October 14, 2003, the date that the Fouts Prepared Reports were filed.

**11 U.S.C. §727(a)(4)(A)**

11. 11 U.S.C. §727(a)(4) is one of the specified code sections referenced in 11 U.S.C. §727(a)(7) and it provides in subsection (A) that the court shall grant the debtor a

discharge, unless - the debtor knowingly and fraudulently, in or in connection with the case - made a false oath or account. The UST maintains that the Debtor knowingly and fraudulently made a false oath when he signed the Fouts Prepared Reports.

12. In order for the UST to prevail under §727(a)(4)(A), she must prove that (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with the intent to defraud or deceive; and (5) the statement related to Reliable case in a material way. *Tauber*, 349 B.R. at 557-58; *Fink*, 351 B.R. at 525. *Chadwick*, 335 B.R. at 702.

13. The Debtor does not dispute that: (a) the Fouts Prepared Reports inaccurately reflected the Reliable's tax liability; (b) he signed the Fouts Prepared Reports under penalty of perjury and (c) his "oath" under penalty of perjury was made "in or in connection with the case". The Debtor argues only that his discharge should not be denied because he did not "knowingly and fraudulently" make the false oath, i.e., he did not make the false oath with the intent to deceive or defraud.

14. Rare — if not nonexistent – is the case where a debtor provides direct evidence of intent to defraud. Thus, the intent element "can be inferred by circumstantial evidence or inferences based on a course of conduct". *Tauber*, 349 B.R. at 559.

15. "Intent to defraud involves a material representation that you know to be false" or "an omission that you know will create an erroneous impression". *In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998). The degree of intent needed is one where the

debtor knowingly intended to defraud or "engaged in behavior that displayed a reckless disregard for the truth". *In re Yonikus*, 974 F.2d 901, 904 (7th Cir. 1992) (where the Court revoked the discharge under §727(d)).

16. Here, the circumstantial evidence shows that the Debtor did not have the requisite "fraudulent intent to deceive" when he signed the Fouts Prepared Reports on October 13, 2003. The six Fouts Prepared Reports which are the subject of the UST's complaint were all prepared by individuals other than the Debtor, yet the reports that were prepared by the Debtor *prior to Fouts' engagement correctly reflected Reliable's financial condition*, and are not among those reports upon which the UST claims the Debtor made a false oath. The Debtor was first given the Fouts Prepared Reports just minutes before a scheduled meeting between the Debtor, Reliable's counsel, and counsel for Reliable's secured creditors. The purpose of the meeting was to enable Reliable to formulate a confirmable plan that its secured creditors would vote in favor of. It was against this backdrop that the Debtor was given only minutes to review the Fouts Prepared Reports before being instructed to sign them. The Debtor had not been given copies of these reports to review prior to this time. In the few minutes he had to review the reports, the Debtor knew the numbers reflected for the tax liability were understated, but didn't know why, in part, due to his lack of accounting acumen. The Debtor did not know that the reason this number was understated was due to the fact that the reports overstated the amount of taxes that had been paid.

17. The Debtor indicated to Reliable's counsel that the reports were not correct – whether it be because the receivables were understated or some other reason — and was told that the reports could be amended. The Debtor believed that the reports would be amended, in any event, before they were filed with the Court. All six Fouts Prepared Reports were presented to the Debtor at the same time, and he signed all of them within minutes. All six Fouts Prepared Reports were filed on October 14, 2003.

18. Once the Debtor began to undertake the task of "correcting" the Fouts Prepared Reports no later than February, 2004, he discovered several other errors that revealed inconsistencies between reported expenses that had accrued, expenses that had been paid, and the remaining payables. Even Reliable's Counsel was not aware of the inconsistencies on the Fouts Prepared Reports until they were pointed out to him in cross examination at trial.

19. The Debtor acted on his own volition to prepare amended operating reports for the periods covered by the Fouts Prepared Reports. Those amended reports – although not filed with the Court – accurately disclosed the amount of taxes paid by Reliable during those periods.

20. The Debtor also acted on his own volition to prepare operating reports for the periods subsequent to the Fouts Prepared Reports (September through December, 2003) in which he accurately disclosed the amount of taxes paid by Reliable during those periods.

21. The only "false oaths" the Debtor is accused of making relate to his signature on each of the six Fouts Prepared Reports. All those reports were presented to the Debtor at the same time, and he signed them at the same time. They were prepared by someone other than the Debtor and even Reliable's counsel was not aware of the discrepancies in them until trial in this matter. Although a false oath can't be redressed by a subsequent correction, the evidence here shows that the Debtor on his own initiative undertook the task of not only correcting the Fouts Prepared Reports but of also preparing the reports that covered time periods subsequent to that point. Both the reports originally prepared by the Debtor and the Fouts reports "corrected" by the Debtor accurately reflected Reliable's tax liability.

22. The Court finds that the "false oath" made by the Debtor in the Reliable case was not made knowingly and fraudulently, and therefore concludes that the UST has not met its burden in proving that the Debtor should be denied his discharge under §727(a)(4). The appropriate judgment entry will follow.

# # #

Distribution:

Charles Wharton/ Mark Drummond, Attorneys for the Plaintiff
Bret Clement, Attorney for the Defendant/ Debtor
Case Trustee